Ennis-Flint, Inc. v. Greer, 2019 NCBC 11.

| | |
|---|---|
| STATE OF NORTH CAROLINA<br>COUNTY OF GUILFORD | IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION<br>18 CVS 3612 |
| ENNIS-FLINT, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT WILLIAM GREER and GP<br>INNOVATIONS, LLC,<br><br>Defendants. | **ORDER & OPINION ON<br>MOTION FOR PRELIMINARY<br>INJUNCTION** |

THIS MATTER is before the Court on Plaintiff's Motion for Preliminary Injunction ("Motion"). The Court, having considered the Motion, the briefs in support of and in opposition to the Motion, the arguments of counsel at the hearing, the record evidence filed by the parties, and other appropriate matters of record, FINDS and CONCLUDES, in its discretion, that the Motion should be GRANTED.[1]

*Kilpatrick Townsend & Stockton, LLP by Jason M. Wenker, Elizabeth L. Winters, and Joel D. Bush, II, for Plaintiff.*

*Williams Mullen by Michael C. Lord, Edward S. Schenk, III, and Richard T. Matthews for Defendants.*

---

[1] A copy of the Order & Opinion without redactions was posted under seal on February 6, 2019. This Order & Opinion includes limited redactions in paragraphs 27 and 106 of the body and paragraph 8 of the conclusion in order to protect information the Court concludes, based on the parties' submissions, represent information which is presently commercially sensitive, and the disclosure of which may be harmful. While the nature of the claims has required the parties to submit a significant volume of material under seal, including any such information in this Order & Opinion has been kept to a minimum, and the Court concludes that the limited redactions do not detract from a public understanding of the matter before the Court and the Court's ruling.

Gale, Judge.

## I.   PROCEDURAL HISTORY

1.     Plaintiff Ennis-Flint, Inc. ("Ennis-Flint") filed its Complaint on February 27, 2018, against its former employee Defendant Robert William Greer ("Greer") and the company he formed after leaving Plaintiff's employ, Defendant GP Innovations, LLC ("GPI"), asserting claims of breach of contract, misappropriation of trade secrets, conversion, trespass to chattels, and unfair or deceptive trade practices. (Compl., ECF No. 3.)

2.     The matter was designated a Mandatory Complex Business case on February 28, 2018, (Designation Order, ECF No. 1), and assigned to the undersigned, (Assignment Order, ECF No. 2.)

3.     Plaintiff filed a motion for a Temporary Restraining Order ("TRO") on March 5, 2018. (Mot. for TRO, ECF No. 8.) The Court adopted and entered a Consent TRO on March 9, 2018.  (Consent TRO, ECF No. 23.)

4.     Although recently modified, the Consent TRO remains in force and has remained in place during several months of discovery and motions practice, including forensic examination of multiple devices.

5.     The Complaint and Consent TRO are based, in part, on a May 20, 2010, agreement titled "Trade Secret, Non-Competition and Non-Solicitation Agreement." ("Greer Agreement"). (Compl. Ex. B, [hereinafter, "Greer Agreement"], ECF No. 3.) The Greer Agreement includes ongoing protection of Ennis-Flint's proprietary

2

information and also includes a noncompetition covenant and a covenant against solicitation, each with a temporal duration that has now expired.

6.     Defendants filed Defendants' Motion to Modify the Consent TRO to eliminate enforcing the covenants in the Greer Agreement that lapsed on September 12, 2018. (ECF No. 83.) The Court modified the TRO to that effect on January 15, 2019. (Order Modifying and Extending TRO, ECF No. 171).

7.     The Consent TRO expressly required Greer to preserve evidence and to turn over designated devices, as well as the more general requirement that Defendants surrender "any and all electronic device(s) in their possession, custody, or control that reasonably may contain Ennis-Flint's Trade Secrets..." and other devices which have been connected to them. Consent TRO at ¶ 3. Forensic examination of those devices has now documented, and Greer has admitted, that Greer failed to preserve information as ordered, instead spoliating evidence. (*See generally* McCollough First Aff., ECF No. 80; Def.'s Resp. to Pl.'s Mot. for Sanctions, [hereinafter, "Resp. Sanctions Mot."], ECF No. 107; McCollough Second Aff., ECF No. 129.)

8.     Following discovery of this spoliation, Plaintiff filed its Motion for Sanctions for Intentional Spoliation of Evidence and for Show Cause Order Regarding Criminal Contempt. (ECF No. 77). This motion will be addressed in a different opinion. This order and opinion addresses only the motion for preliminary injunction but includes the factual background of the spoliation as it provides context for the injunction.

3

9. The parties have filed extensive affidavits, with attached documentation. Each of the parties moved to strike certain portions of those filings. In the sound exercise of the Court's discretion, all such motions are denied. The Court has considered all matters of record, has considered the parties' arguments, and has given the appropriate weight to any item of evidence.

10. The Motion has been fully briefed, and the Court heard argument on all pending motions on December 5, 2018. The Motion is ripe for determination.

## II. FINDINGS OF FACT

11. The Court makes the following Findings of Fact solely for purposes of this Motion. Any Finding of Fact that should be more properly so considered shall be considered a Conclusion of Law.

12. Ennis-Flint is a North Carolina corporation with its principal place of business in Greensboro, North Carolina, which is engaged in the research, development, manufacture, and sale of pavement marking materials, including thermoplastic products, traffic paints, and colored aggregates. (Soule Aff. ¶ 5, ECF No. 15.) Ennis-Flint is the surviving corporation as a result of a merger transaction involving Flint Trading, Inc.; Flint Acquisition Corp.; Ennis Paint, Inc.; and LKF, Inc. (Soule Aff. at ¶ 3.)

13. Greer is a citizen of North Carolina residing in Davidson County, North Carolina. Greer is a chemist who began working for Flint Trading, Inc. in 2003 and then continued his employment with Ennis-Flint after the merger. (Prelim. Inj. Aff. Robert Greer ¶¶ 2–9, [hereinafter, "Greer PI Aff."], ECF No. 96.1.) In 2012, he was

4

promoted to Ennis-Flint's Director of R&D. (Young Second Aff. ¶ 5, ECF No. 113.) In May 2017 he was given the title International Director of R&D. (Young Second Aff. at ¶14.)

14.    Greer resigned his employment on September 11, 2017. (Compl. at ¶ 35.) The parties dispute the reasons that led to his departure and what conversations occurred between Greer and various Ennis-Flint employees when he was leaving. The Court finds it unnecessary to resolve these factual differences to resolve the Motion.

15.    GPI is a LLC of which Greer is the Managing Member and which Greer reports is now his sole source of income. (Greer PI Aff. at ¶ 11.) GPI is in the business of adhesives distribution, which includes use of hot melt polyamides. (Greer PI Aff. at ¶ 28.)

16.    Ennis-Flint maintains a repository of confidential formulas, specifications and raw materials information for each of its products, referred to as the Product Vision database. ("Product Vision Database"). (Stoffer Aff. ¶ 9, ECF No. 11.) Ennis-Flint has a separate server for its research and development files, with more than 250,000 individual files, many of which Ennis-Flint considers and treats as confidential. (Stoffer Aff. at ¶ 13.)

17.    Ennis-Flint has and protects both the Product Vision Data and a research and development data base, as well as other confidential information, including experimental data and results, project reports, internal research and development presentations, lab to production scaling procedures, process reports,

5

pricing information and other competitive data, internal data systems containing confidential information regarding business processes, product specifications and formulas, and other research and data information. (Madison Aff. ¶¶ 9–10, ECF No. 16.) The Court refers to this information collectively as "Ennis-Flint Trade Secrets," it being understood that the term does not extend to information that has become publicly known through no fault of Defendants.

18.     Greer had access to the Product Vision Database and other portions of Ennis-Flint Trade Secrets in the course of his employment with Ennis-Flint, although at the time of his departure Greer maintained that information on his company issued laptop stored in files which varied from Ennis-Flint's normal file structure. (Madison Aff. at ¶ 10.) He helped to develop many of the formulas within the database and was involved in over fifty granted or pending patent applications filed by Ennis-Flint. (Greer PI Aff. at ¶ 9.)

19.     Others also contributed to the database. The Ennis-Flint Trade Secrets reflect Ennis-Flint's substantial monetary investment in research and development. Ennis-Flint spent $4.7 million in research and development in 2017, with Greer responsible for or overseeing much of that effort. (Soule Aff. at ¶ 6.)

20.     Ennis-Flint has presented evidence that the Ennis-Flint Trade Secrets, and the Product Vision database in particular, have yielded substantial commercial success and could not be easily duplicated by others.

21.     Ennis-Flint has implemented procedures necessary to protect the secrecy and confidentiality of the Ennis-Flint Trade Secrets, including the following:

a. This information is available to Ennis-Flint employees only on a need-to-know basis. (Madison Aff. at ¶ 12.)

b. Access requires a login and security code. (Madison Aff. at ¶ 16.)

c. Passwords must be "strong" passwords meeting certain minimum requirements. (Drye Aff. ¶ 7, ECF No. 13.)

d. Access is limited to specific employees. For example, only eleven of Ennis-Flint employees had full access while only eighty-four of the company's 1,115 employees had any access as of March 2018. (Drye Aff. at ¶ 9.)

e. Formulas printed from the database are automatically stamped "Confidential." (Madison Aff. at ¶ 16.)

f. Ennis-Flint does not allow access to the database by global affiliates or subsidiaries. (Madison Aff. at ¶ 16.)

g. Certain formulas within the database are subjected to further security measures, commensurate with their importance. (Madison Aff. at ¶ 16.)

h. The Ennis-Flint research and development group maintains a separate server for its data, and each employee within the research and development department has private folders which are not open to general access. (Madison Aff. at ¶ 17.)

i. Ennis-Flint maintains security cameras outside of its R&D Department; prohibits the attachment of personal hardware to company computers; and uses software to log all access, copying, and modification of each file.

(Drye Aff. at ¶ 12)  Furthermore, the R&D Department can only be accessed using a key, keycard, and/or passcode entry.  (Madison Aff. at ¶ 19.)

    j.   Ennis-Flint requires all employees to sign confidentiality, noncompete, and nonsolicitation agreements.  (Madison Aff. at ¶ 13.)

22.    Greer's initial employment terms in 2003 required his commitment to a negative competition and solicitation covenant.  He signed an initial employment agreement including those terms.  (Soule Aff. at ¶ 13.)  Subsequently, when preparing for a merger, the company was unable to locate the original agreement.  (Soule Aff. at ¶ 15.)  Greer signed the replacement Greer Agreement in 2010.  (Soule Aff. at ¶ 15; Greer Agreement.)

23.    Greer was given consideration beyond continued employment in exchange for his entering the Greer Agreement.  First, the replacement included less restrictive negative covenants, replacing the former broader covenants.  Second, the Greer Agreement was a condition of Greer's participation in the company's 2010 Stock Purchase Plan.  Pursuant to that plan, Greer sold phantom shares that had been granted to him.  (Soule Aff. at ¶ 15.)

24.    Flint Acquisition Group was the corporate party to the 2010 Greer Agreement.  The Greer Agreement was assigned to Ennis-Flint through the merger documents which formed Ennis-Flint.  (Greer Aff. at Exs. 4 & 5, Merger Agreement, ECF No. 101.)

25.    In pertinent part, the Greer Agreement provides:

1. Trade Secrets

Employee hereby acknowledges and agrees that: (a) the activities of Company constitute a highly specialized business; (b) Company has conducted and intends hereafter to conduct a substantial amount of business within the Territory (as defined below); and (c) through Employee's associations with Company Employee will obtain confidential information of Company relating to Company's products and services, including without limitation technical and marketing information regarding the processes, practices, expertise, and know-how of Company, the pricing policies and other business and financial operations of Company, lists of past and present customers of Company, and information regarding customer relationships under development or intended to be developed by Company (collectively, the "Trade Secrets"). Employee hereby acknowledges and agrees that the Trade Secrets are valuable, unique, and special assets of Company. Employee hereby agrees that Employee shall not disclose or make available any Trade Secret to any person or entity other than Company and shall not utilize any Trade Secret other than for the exclusive benefit of Company and its Affiliates. The provisions of this Section 1 shall be in addition to, and not in lieu of, any other rights and remedies that Company may have at law or in equity with respect to the Trade Secrets. Notwithstanding any provision in this Agreement to the contrary, the term "Trade Secrets" shall not include any information that: (a) is or becomes part of the public knowledge or literature other than as a result of any action by Employee in violation of this Agreement; (b) is acquired by Employee after termination of his employment with the Company from a third party whose disclosure of such information is not, to Employee's knowledge, in violation of an obligation of confidentiality to Company; (c) is independently developed by Employee after termination of his employment with Company without the use of Trade Secrets; or (d) is approved for release by Employee pursuant to written authorization of Company.

2. Non-Competition Covenant
   a. During the Covenant Term (as hereinafter defined), Employee shall not do any one or more of the following:
      i. ...
      ii. Solicit any person or entity who is a customer of Company at any time within the twelve (12) month period ending as of the date that Employee's employment by Company ceases for any reason to purchase from any person or entity other than Company or an Affiliate of Company any product or service that is competitive with any product or service offered by company....

9

(Greer Agreement at 1–2.)

26. "Trade Secrets" as defined by the Greer Agreement are the subject of Greer's contractual undertakings and obligations which the Court will hereafter refer to as "Ennis-Flint Confidential Information," which is different from the term "Ennis-Flint Trade Secrets" defined in paragraph 17 above.

27. Greer admits that Ennis-Flint's Product Vision Database includes trade secrets and other confidential information that should be kept secret. In an e-mail exchange in March 2017, Defendant Greer said of Product Vision formula PAF2735, "I recommend we keep this formula in-house as a trade secret." (Pl.'s Br. in Supp. of Mot. for Prelim. Inj. Ex. 2, ECF No. 90.2.) In an e-mail exchange in May 2014, Greer was asked, "is there any problem with including the ███████████ in a patent application or does it need to remain a trade secret?" (Pl.'s Br. in Supp. of Mot. for Prelim. Inj. Ex. 3, ECF No. 90.3.) He responded, "I would prefer to keep it a trade secret." (ECF No. 90.3.) In that same thread, Greer also says of ██████, "...we are now calling it ██████ is our secret formula number" (ECF No. 90.3.) In that same exchange, Greer reveals that "the 'key' ingredient" for ██████ is ██████. (ECF No. 90.3.)

28. Greer returned his company laptop before leaving his employment. (Young First Aff. at ¶ 15.) It appears uncontested that the laptop included essentially a complete set of Ennis-Flint's formula database. (McMinn First Aff. ¶ 12, ECF No. 10; Pl.'s Br. in Supp. of Mot. for Sanctions Ex. 2 14–16, Excerpts Greer Dep., ECF No. 78.3.)

10

29.    Greer also returned a company-issued iPhone he regularly used and an older company-issued phone that was no longer operable. (Young First Aff. at ¶ 15.)

30.    Ennis-Flint maintained policies known to its employees which prohibited "attaching personal hardware to company computers" and "storing company data on mobile devices, including, without limitation, mobile phones, external hard drives or USB devices." (Young First Aff. at ¶ 5.) Greer signed statements acknowledging receipt and understanding of those policies. (Soule Aff. Ex. C & D, ECF No. 15.3 and 15.4.) Greer agreed to "strictly adhere" to his employer's rules and regulations. (Soule Aff. Ex E, ECF No. 15.5.)

31.    When leaving his employment, Greer neither returned nor advised Ennis-Flint that he had copied Ennis-Flint information onto external devices. (Young First Aff. at ¶ 15.)

32.    The parties dispute whether Greer has misused Ennis-Flint Confidential Information or Ennis-Flint Trade Secrets and whether a broad injunction is necessary to prevent any further misconduct involving that information. While, in part, the record establishes that at the time of his departure Greer maintained copies of almost four thousand formulas from within Ennis-Flint's database, the evidence reflects that Greer opened only a few of those formulas after his departure. These included product formulas for which he had no responsibility while employed. Ennis-Flint emphasizes its contention that Defendants inappropriately used two specific Ennis-Flint formulas to develop two products

11

known as ARES 318 and SHIVA 5500. Greer contends and Ennis-Flint denies that Defendants independently developed these products without use or need to use Ennis-Flint's formulas, Ennis-Flint Trade Secrets, or Ennis-Flint Confidential Information.

33. Ennis-Flint contends and Greer denies that the formula for ARES 318 is effectively a copy of Ennis-Flint's proprietary formula, with only slight and materially insignificant variations. Ennis-Flint suggests and Greer denies that Greer accessed Ennis-Flint formulas because he intended to unfairly compete with Ennis-Flint, and in doing so, both violated his noncompetition agreement and used and, unless enjoined, intended to continue to use Ennis-Flint's proprietary information that it had unlawfully copied and taken after ending his employment with Ennis-Flint. The Court need not now address any issue involved with the noncompetition covenant which has expired.

34. The Court's consideration of the evidentiary record on these contested points is informed, in part, by Greer's spoliation of evidence and how it may affect Greer's credibility measured against the documentary evidence and any potential inference that might arise from what other documentation might have been available but for spoliation.

35. Accordingly, before examining the specific evidence regarding Greer's collection of Ennis-Flint information which he took with him and which he may have used after leaving employment with Ennis-Flint, the Court first catalogs the evidence of Greer's spoliation.

12

36.     In summary, the Court finds: that prior to leaving his employment with Ennis-Flint Greer connected either his personal laptop or multiple external devices to Ennis-Flint's various information systems; that these external devices, in combination, contained a complete set of Ennis-Flint product formulas, including some that were unrelated to products for which Greer had any employment responsibility and which he would not have been expected to have, (McMinn Second Aff. Ex. C, ECF No. 137); that Greer was still in possession of the copies of those formulas as of the date Ennis-Flint filed the lawsuit and at the time the Court entered the Consent TRO; that Greer had accessed one or more formulas taken from the Product Vision Database after leaving his employment with Ennis-Flint and before the filing of this litigation; that after receiving notice of the litigation and Ennis-Flint's claims, and in violation of both his general duty to maintain evidence and of the Court's order that he do so, Greer undertook systematic efforts to destroy evidence, including any evidence that he had possessed or accessed Ennis-Flint's Product Vision database or other confidential files, and to cover up that he had done so; that he continued to misrepresent facts regarding his possession or use of this information to the Court, Ennis-Flint, and his own counsel; that ultimately the fruits of forensic examination made any further such denials incredible; that thereafter Greer admitted his spoliation of evidence; and that further forensic examination may be required to detail fully the extent of what information may be recovered and what information may have been irretrievably lost. The need for such forensic examination

13

is, in part, the reason the Court defers its determination of what sanctions it will impose.

37.    Early in the litigation, Greer adamantly contended that he had been a "good leaver," and to the extent he maintained possession of Ennis-Flint's confidential information, he did so solely for protective reasons in the event of a whistleblower action and with no intent to access for any other purpose and with no competitive need to access any Ennis-Flint information.[2] Forensic examination now documents that Greer in fact accessed Ennis-Flint formulas after leaving his employment in a manner and for purposes that have no relationship to any potential whistleblower activity.

38.    Ennis-Flint filed its Complaint on February 27, 2018. A process server first sought service on February 28, 2018, at Greer's home. In response, Greer's wife advised Greer, who was then out of town, that delivery of some paper had been attempted. (Resp. Sanctions Mot. at 1.) The complaint was served on March 1, 2018, by service on Greer's wife. (Resp. Sanctions Mot. at 2.) Greer's wife then read portions of the lawsuit to Greer while he remained out of town. (Resp. Sanctions Mot. at 2.)

---

[2] Defendant asserts in their Fifth Defense that Ennis-Flint engaged in a pattern of inappropriate activity, including misrepresentations in sales and formulations. Plaintiff has moved to strike the defense. The Court defers its consideration pending a determination whether Defendants' answer should be struck in whole or part as part of sanctions to be imposed.

14

39. Ennis-Flint filed its Motion for Temporary Restraining Order with supporting materials on March 5, 2018, which were served on Defendants on March 6, 2018.

40. Greer had retained counsel by March 6, 2018, and his counsel advised him of his duty and obligation to maintain any evidence, including electronically stored information ("ESI"). (Wenker Aff. ¶ 3, ECF No. 79.)

41. Clearly, Greer was on notice of Ennis-Flint's claims no later than March 1, 2018, and was specifically aware of his obligations to preserve evidence no later than March 6, 2018.

42. The Parties filed a proposed Consent Temporary Restraining Order on March 8, 2018, which the Court entered on March 9, 2018. (ECF No. 25.)

43. Among other provisions, the TRO mandated that Defendants should not "destroy, remove, transfer, or alter any documents, data, information, or tangible things — including computer files or other electronic data, and devices on which such computer files or other electronic data may be stored" that related to Ennis-Flint's claim based on the Trade Secrets Agreement or North Carolina's Trade Secrets Protection Act (the "Trade Secrets Act"). (Consent TRO at ¶ 1.a.)

44. The Consent TRO further mandated that Greer would by March 9, 2018, surrender several enumerated devices for forensic examination, including an iPhone 6, a Lenovo laptop, eight identified USB devices, and any "other USB external storage devices in Greer's possession." (Consent TRO at ¶ 3.) Defendants were mandated to by March 12, 2018, provide "any and all electronic device(s) in their

15

possession, custody, or control that reasonably may contain Ennis-Flint's" information, including any device Greer may have used for any form of electronic messaging after his resignation. (Consent TRO at ¶ 3.)

45. The Court refers to Greer's personal Lenovo laptop which he continued to possess after leaving Ennis-Flint's employ as the "Greer Laptop." It should be distinguished from the Ennis-Flint company issued laptop which Greer returned when leaving his employment on September 11, 2017.

46. After the Consent TRO was entered, the Parties negotiated a protocol to govern forensic examination of the devices Greer was to submit. On or before March 12, 2018, Greer or his counsel provided twenty-one devices for forensic examination. Forensic examination has identified that there may be other devices which have not yet been submitted. After his September 2018 deposition, Greer submitted an iPhone 7 that was not identified in the Consent TRO. The evidence is not currently definitive as to whether it was in service before Greer left Ennis-Flint's employ.

47. After preliminary forensic examination, the parties retained a second forensic engineer, Jason McCollough of Envista Forensics, to secure his advanced forensic expertise. The parties then negotiated a more detailed forensic protocol. The protocol provided that counsel for all Parties would have access to McCollough but that any files from Greer's devices would be provided first to Defendants' counsel for review as to relevancy and privilege before being produced to Ennis-Flint.

16

48. The protocol provided that McCollough would use certain search terms to isolate any Ennis-Flint data that may be on the various devices, with priority attention seeking information related to Ennis-Flint's Product Vision Database. Two key search terms in this regard were "PV" and "Product Vision." (McCollough First Aff. at ¶ 3.)

49. Envista reported that the search terms "PV" and "Product Vision" yielded more than 8,000 "hits" in over 4,000 files.

50. Envista exported information regarding those files to Defendants' counsel. Thereafter, Defendants' counsel produced only approximately 200 documents from the exported files. Plaintiff's counsel raised a concern that the number of documents produced were less than the number of "hits" would suggest were responsive and should have been produced.

51. On May 29, 2018, Greer submitted an affidavit swearing that he had not taken and did not possess the particular Ennis-Flint formulas which have now come into specific focus.

52. The Court held an informal discovery conference on July 20, 2018. Defendants' counsel expressed its understanding that the "hits" McCollough had found resulted from certain "fragments" being left on the devices but that any actual "file" associated with those fragments was only an artifact from times when Greer may have used files during the course of his employment with Ennis-Flint and may fairly be referred to as gibberish, such that a print-out of the "file" would reveal no

17

meaningful information. The evidence raises no suggestion that counsel's statement was made in anything other than good faith.

53. One week later, on July 27, 2018, McCollough advised counsel for the parties that the "fragments" were, in fact, remnants of files that had existed intact on Greer's devices after he had left his employment on September 11, 2017, but were deleted or overwritten thereafter and which may have remained intact as recently as December 28, 2017. (McCollough First Aff. at ¶ 3.)

54. On August 14, 2018, based on further forensic examination, McCollough advised counsel for the parties that some Product Vision files had been uploaded to the Greer Laptop from an external device on December 28, 2017, and remained on the Greer Laptop as late as January 11, 2018. (McCollough First Aff. at ¶ 4.) He concluded that those same files had existed as late as March 7, 2018, on at least one of the various external devices that had been submitted for forensic examination. He further concluded that some Product Vision files may have been exported to cloud storage in a Microsoft One Drive folder and that the Greer laptop had been used on March 7, 2018, to access the Microsoft One Drive folder. McCollough further concluded that those files which had existed on December 28, 2017, and March 8, 2018 on the devices in question no longer existed. (McCollough First Aff. at ¶ 4.) The suspicion of Greer's spoliation of evidence was now apparent.

55. On August 16, 2018, McCollough advised counsel that a data wiping tool known as Eraser had existed both on the Greer Laptop and on an external device that had been plugged into the Greer Laptop; that the Eraser program had been run

18

multiple times between March 9 and March 12, 2018; and that the Eraser program had scrambled file or folder names in such a manner that McCollough could not document each of the files or the data that had been deleted. (McCollough First Aff. at ¶ 5.) He reported further that Eraser had been used to cause bulk deletions and targeted deletion of Product Vision files and that altogether Eraser was used to cleanse nine different locations, with at least seven of those locations being cleansed after March 9, 2018. (McCollough First Aff. at ¶ 5.)

56. On August 21, 2018, McCollough further advised counsel that at least three of the Eraser tasks he had described were manually created on March 9, 2018, for the purpose of erasing Product Vision files. In addition, several steps were taken to utilize the Eraser program to scramble information and prevent a retracing of where Product Vision files had previously existed but were deleted. (McCollough First Aff. at ¶ 5.) McCollough further reported that another data wiping tool known as RegDelNull had been downloaded to the Greer Laptop on the afternoon of March 9, 2018, and executed shortly after being downloaded. (McCollough First Aff. at ¶ 5.) This program is used to remove registry files that would normally not be deleted by other programs but which if not erased would contain evidence that would be useful in retracing prior efforts, such as lists of recent files or documenting recent evidence of the use of data erasing tools.

57. On August 23, 2018, McCollough furnished a written report. As of that date, McCollough had only analyzed the use of data wiping tools on the Greer Laptop and one external device which had been connected to the Greer Laptop. (Pl.'s Br. in

19

Supp. of Mot. for Sanctions Ex. 4, [hereinafter, "Envista Eraser Report"], ECF No. 78.5.) The Envista Eraser Report explained that the Eraser Program is generally used to permanently delete information and prevent a retracing of steps taken to erase information and that two versions of the Eraser Program had been installed on the Greer Laptop, the second having been installed on March 12, 2018. (Envista Eraser Report.) The Envista Eraser Report also stated that all of the executable files from the Eraser programs had been deleted. (Envista Eraser Report.) However, McCollough was able to determine that a user named "Rob" had utilized one of the features of the Eraser program that has a setting called "Replace erased files with the following files to allow plausible deniability." (Envista Eraser Report.)

58.     In total, between March 5 and March 12, 2018, Eraser had been used to target, destroy, and overwrite electronic documents, including documents from the Product Vision database copied onto Greer's devices. (Envista Eraser Report.)

59.     The Court held an in-person status conference on August 28, 2018, which Greer attended. At this conference, based on these forensic reports, Defendants' counsel made a forthright admission that Greer had deleted information in violation of the Consent TRO and Greer's duty to preserve evidence. The Court clearly noted the severity with which it accepted the admission, leaving open how it might utilize the various procedures available to it to redress the reported activities. The parties briefly discussed whether Greer's immediate deposition might be necessary to provide Ennis-Flint some assurances as to whether its confidential information had been distributed to others or was still under Defendants' control.

60. On September 8, 2018, McCollough provided counsel with another written report describing the use of the RegDelNull program. (Pl.'s Br. in Supp. of Mot. for Sanctions Ex. 5, [hereinafter, "Envista RegDelNull Report"], ECF No. 78.6.) McCollough determined that the program had been downloaded onto the Greer Laptop on the afternoon of March 9, 2018, and was executed a few minutes after downloading. Envista RegDelNull Report. The use of Eraser and RegDelNull in combination permanently deleted information that cannot be recovered.

61. On September 9, 2018, McCollough supplied a third written report regarding the use of a third disc cleaning program known as CCleaner. (Pl.'s Br. in Supp. of Mot. for Sanctions Ex. 6, Envista CCleaner Report, ECF No. 78.7.) Unlike the other programs, CCLeaner is often used for proper maintenance with no improper motive, but is also capable of being used for malicious data destruction. The report indicated that this program had been installed on Greer's devices at some time between February 23, 2018, and the date on which it was last run, on March 8, 2018. Running the program would have permanently destroyed otherwise recoverable information.

62. McCollough documented the above conclusions in his further affidavit filed on November 8, 2018. (McCollough Nov. 8 Aff. Ex. A, ECF No. 108.1.)

63. Following the status conference on August 28, 2018, negotiations were undertaken regarding Greer's possible deposition, recognizing the potential consequence of admissions that Greer might be called upon to make. On September 28, 2018, the Court entered a Second Consent Protective Order which allowed Greer's

counsel to state an objection based on the Fifth Amendment after which Greer would then testify. The order provided that any testimony Greer might give could be used for any purpose in this litigation but provided that the testimony would not be used in other collateral litigation unless ordered by the court presiding over that collateral litigation. The Court expressed no opinion whether Greer continues to enjoy any Fifth Amendment protection against incrimination after testifying upon deposition.

64. Greer was deposed on September 28, 2018.

65. While Defendants challenged whether Greer's deposition testimony should be considered after Plaintiffs filed a motion to show cause as to contempt, the Court neither makes nor depends on any finding of fact that is supported only by Greer's testimony. The Court would have made the same findings of fact and entered the same preliminary injunction whether or not Greer had been deposed. There is independent evidence sufficient to support the Court's Findings of Fact and Conclusions of Law expressed in this Order & Opinion.

66. In fact, Greer's counsel begins Defendants' Response to Plaintiff's Motion for Sanctions with the statement: "Rob Greer destroyed the 3,993 PDF copies of PV files he had retained after resigning from Ennis-Flint. Thereafter, he took steps to conceal the destruction." (Resp. Sanctions Mot.)

67. After his deposition, Greer was ordered to submit an iPhone 7 for forensic examination.

68. At the hearing on Plaintiff's Motion for Preliminary Injunction, held on December 5, 2018, McCollough presented testimony regarding his preliminary but

incomplete forensic examination of this iPhone. He concluded that the phone had been reset to its original factory settings between the time of Greer's deposition and being submitted for forensic examination. As a consequence, some data pertinent to the hearing may have been irretrievably lost. McCollough could not say whether the iPhone 7 had been in use prior to March 2018. (*See also* McCollough Second Aff.)

69. Greer did not testify but his counsel suggested that the reset of the phone and any loss of information had been inadvertent when Greer attempted to back up the data on the iPhone 7 before submitting it for forensic examination.

70. McCollough suggested that the reset and consequent loss of information had been intentional, relying only on a document he found from a Google search. The Court has not relied on that testimony. At this time, the Court is unable to find whether any loss of information was inadvertent, negligent, or intentional but notes that the attempt to back up the iPhone in question was undertaken by Greer after he was well aware of the suspicion surrounding his other misconduct and without supervision or permission of his counsel.

71. Ennis-Flint has submitted other affidavit testimony, which, although not conclusive, suggests that Greer may have had the iPhone 7 in use as early as September 9, 2017, prior to leaving Ennis-Flint's employ. (McMinn Second Aff. ¶ 16, ECF No. 134.)

72. Without the need of this additional forensic examination, the Court finds that Greer has repeatedly and consistently undertaken knowing and intentional action to destroy evidence, knowing that doing so was prohibited by his duty to

23

preserve evidence and by the Consent TRO to which Defendants were bound and that Defendants have shown a manifest disregard for the Court's orders and for the integrity of the judicial process.

73. The Court defers its determination of what sanctions it will impose for this conduct until any necessary forensic examination is complete. However, the course of destroying evidence provides context against which other evidence should be considered while evaluating the parties' contentions.

74. With this context, the Court returns to its examination of the evidence as to how Greer came to possess the Ennis-Flint Confidential Information and Ennis-Flint Trade Secrets that he took with him after leaving employment with Ennis-Flint, how Defendants have or may have improperly accessed or used that information, and what preliminary injunctive relief may be necessary and appropriate to preclude harm. The Court begins with its review of evidence of efforts Greer took in preparation for taking Ennis-Flint information with him after leaving its employ.

75. During the course of early discovery and initial hearings, Greer steadfastly maintained that he undertook no particular efforts to gather Ennis-Flint's information to any greater extent than he had possessed and used in the regular course of employment with Ennis-Flint.

76. There is substantial evidence to the contrary.

77. There is evidence that, in preparation of his potential leaving Ennis-Flint's employ, Greer took both special efforts to gather Ennis-Flint information, including but not limited to information which he would have used in the course of

24

his employment, to delete information that may have been on his company issued laptop before returning it to Ennis-Flint, and further took special efforts to prevent Ennis-Flint from discovering that he had done either of these things.

78. Greer had from time to time in his employment copied certain files to facilitate his travel for Ennis-Flint. However, the extent of his copying of Ennis-Flint formulas increased beginning in 2016 and continued until his departure, and when he left the file structure in the PV folder on Greer's laptop was not the same file structure as found within the Product Vision Database itself. (Stoffer Aff. ¶ 12, ECF No. 11.)

79. On February 5, 2106, he copied formula PAF2526. This is the formula Ennis-Flint claims was used to create SHIVA 5500. (McMinn Second Aff. at ¶ 6.) On February 20, 2017, he copied formula PAF2735. This is the formula Ennis-Flint claims was used to create ARES 318. (McMinn Second Aff. at ¶6.)

80. On December 6–7, 2016, Greer copied 289 formulas related to preformed thermoplastic applications. (McMinn Second Aff. at ¶ 6.)

81. On May 24–25, 2017, Greer accessed a folder on his company laptop containing over 1,000 of Ennis-Flint's master formulas, (Stoffer Aff. at ¶ 7), and copied 359 formulas related to preformed thermoplastic applications. (McMinn Second Aff. at ¶ 6.) He copied an additional 136 such formulas on May 30, 2017. (McMinn Second Aff. at ¶ 6.)

82. On August 10, 2017, Greer accessed two files on Ennis-Flint's research and development folder related to Ennis-Flint's in-house latex production, which

25

Ennis-Flint considers two of its most closely guarded trade secrets. While Greer had general oversight responsibilities as director of research and development, he had not personally contributed to the research reflected in these files which are not a core part of Ennis-Flint's business in polyamides and preformed thermoplastics, which were the areas of Greer's primary responsibilities. (Stoffer Aff. at ¶ 8.)

83.    On August 10, 2017, Greer accessed 7 subfolders in the PV Database and 115 formulas. (Stoffer Aff. at ¶ 15.)

84.    On August 17, 2017, Greer accessed files within the Product Vision Database and attached an external storage device to his laptop, after which he accessed files on his laptop containing information from the Ennis-Flint Product Vision database. (McMinn Second Aff. at ¶ 7; Stoffer Aff. at ¶ 16.)

85.    On September 8, 2017, Greer attached an external storage device, and Ennis-Flint's anti-virus software catalogued that the external device contained almost 4,000 files, many of which were from the Product Vision database. (McMinn Second Aff. Ex. C ¶ 10, ECF No. 137.)

86.    On September 10, 2017, Greer connected an external storage device to his company laptop and transferred approximately 23,000 files from the external device to the laptop, including large segments of formulas, product specifications, prior art research, analytical and testing data, costing data and related materials. (Stoffer Aff. at ¶ 17.) Information on the external device had been taken from the Ennis-Flint research and development server. (Stoffer Aff. at ¶ 19.)

87.     That same day, on September 10, 2017, Greer copied and pasted multiple fully populated Excel spreadsheet files onto his company laptop. Each of the files requires significant storage space on a hard drive. While Greer has suggested that he began such copying only to test transfer speeds and apparently failed to note how many times the coping was carried out, the Court finds the explanation unbelievable. The facts support Ennis-Flint's position that Greer undertook this massive copying of irrelevant information for the purpose of overwriting and destroying files that had been previously stored on the laptop. (McMinn First Aff. ¶¶ 15–17, ECF No. 10.)

88.     When Greer turned in his company laptop, it contained a folder that included thousands of formulas or formula master reports copied from the Ennis-Flint Product Vision database or research and development server, which could not be copied in mass in a single step but would require many individual steps. (Stoffer Aff. at ¶ 18.) Further, no Ennis-Flint employee, including its Director of Research and Development, would have been expected to have this volume of formulas in a single location, especially because Ennis-Flint maintained a segregated server designed to make such possession unnecessary. (Stoffer Aff. at ¶ 12.)

89.     In sum, the weight of the evidence supports the conclusion that, in preparation for leaving his employment with Ennis-Flint, Greer took steps to assure that he could take with him a complete set of Ennis-Flint formulas and significant additional Ennis-Flint Trade Secrets and that this set of information was beyond what he had maintained during the regular course and scope of his employment with

27

Ennis-Flint. His suggestion that he did so solely for the purpose of a potential need in the event of a whistleblower action is belied by the fact that he began to access these files quickly after leaving his employment with Ennis-Flint.

90.     Shortly after leaving Ennis-Flint's employ, Greer filed Articles of Organization to create GPI. (Am. Answer ¶ 39, ECF No. 47.)

91.     Having left his employment on September 11, 2017, Greer accessed files he had taken from Ennis-Flint's databases as early as September 22, 2017. Greer continued to access these files through March 2018, when the lawsuit was begun. (Hepler Third Aff. Ex. 1, ECF No. 147.1.)

92.     By September 24, 2017, Greer had returned from a visit to China and Korea, where he had secured exclusive distributor agreements with companies with which Greer had earlier worked, meaning that thereafter Ennis-Flint could obtain products from these companies only by ordering through Greer. (Excerpt Greer Dep. Ex. 18, ECF 90.4.)

93.     Ennis-Flint did not initially have any concern that Greer would be adverse to Ennis-Flint in any way. In fact, Ennis-Flint considered continuing a consulting relationship with Greer shortly after he terminated his employment. (Discovery Docs, ECF No. 108.3.)

94.     By December 2017, Ennis-Flint had become concerned as to Defendants' activities. Richard Freeman, Vice President of Supply Chain and Procurement at Ennis-Flint, testified that, in December 2017, he was told by representatives of Dow Chemical Company that Greer had solicited business from

28

another Dow customer and provided that customer with information about the terms of Ennis-Flint's confidential supply agreement with Dow. (Freeman Aff., ECF No. 14.) Greer denies this. (Am. Answer at ¶ 40.) Freeman further testified that he was told of a meeting between Greer and an Ennis-Flint supplier, Sincol, where Greer attempted to secure a specialized pigment that Sincol makes exclusively for Ennis-Flint. (Freeman Aff. at ¶ 8.)

95. Ennis-Flint highlights evidence regarding Greer's interaction with another former Ennis-Flint employee, Sunny Deng. Greer and Deng worked together as early as 2006. Deng left Ennis-Flint in 2013. Greer admits that he had hoped at some point that Deng may have sufficient success to justify Greer's working with her company. In 2015, Greer assisted Deng in securing a trademark for a product known as SpiderBond. (Greer PI Aff. at ¶ 191.) Greer, however, asserts that his work with Deng would not have violated the Greer Agreement, as neither he nor Deng had interest in pursuing preformed thermoplastic products. Ennis-Flint contends the evidence suggests otherwise.

96. Deng now owns the Hong Kong registered company "Spider Bond" and works in the polyamide field. (Pl.'s Br. in Supp. of Mot. for Prelim. Inj. Ex. 1 52:14-22, [hereinafter, "Excerpts Greer Dep. Second"], ECF No. 90.1.) Greer has occasionally offered technical advice on polyamide chemistry to Deng since at least 2014 following her leaving the company in 2013. (Greer Dep. Second at 54:10-18.)

97. The forensic analysis raises issues as to whether Greer credibly asserts that he and Deng had no interest in the preformed thermoplastics market. The

analysis identified several documents on Greer's devices that relate to preformed thermoplastic markets in China which appear to have been reviewed and revised by Deng. (Greer Dep. Second at 138–43.) Specifically, forensic analysis reveals that Greer had a document titled, "Chinese Market Potential for Preformed Thermoplastic Pavement Markings," "Pavement Markings in China," and a download identified as "Chinese market assessment and entry plan for preformed thermoplastic pavement markings, SD comments." (Greer Dep. Second at 133–36.) Greer confirmed that "SD comments" referred to comments by Deng but said he had no further memory of why she would be making comments on such a document. (Greer Dep. Second at 139–41.)

98. While Ennis-Flint points to the above evidence, it most strongly relies on Defendants' development of the two products known as ARES 318 and SHIVA 5500.

99. Ennis-Flint contends that Greer copied Ennis-Flint formula PAF2735 to create ARES 318. (Compl. at ¶¶ 63–77; Pl.'s Reply in Supp. of Mot. for Prelim. Inj. 8, ECF No. 99.) The affidavits present battling contentions as to whether the formula for ARES 318 is functionally the equivalent of Ennis-Flint's formula. (*See generally* Hepler Fourth Aff., ECF No. 159; Greer PI Aff. at ¶¶ 53–76.)

100. The Court makes no specific finding in that regard. But it does not have to make such a finding in order to conclude that Defendants' have misappropriated Ennis-Flint's contractually and statutorily protected information. First, Greer was under contract to protect Ennis-Flint Confidential Information. Second, to the extent he utilized any Ennis-Flint confidential to develop any product, there is substantial

question arises whether Defendants can claim the development to have been independent.

101. Significantly, Greer accessed a Product Vision file containing Ennis-Flint's PAF2735 formula on September 22, 2017. (Hepler Third Aff. Ex. 1, R.4.) He has offered no reason he had the need to do so independently of his development of ARES 318.

102. Greer accessed multiple other Ennis-Flint's confidential files on February 19, February 21, and February 25, 2018. (Hepler Third Aff.) Greer has offered no reason why he needed to do so. His access on these dates is in close proximity to Greer's trip to Ecuador. A few days previously, Greer had sent text messages that he was there to set up a new road marking customer. (Excerpt Greer Dep. Ex. 18.)

103. At this time, the Court does not know whether there may have been further evidence regarding these visits that has been lost through spoliation.

104. Ennis-Flint has also maintained that Defendants misappropriated an Ennis-Flint formula when developing a product known as SHIVA 5500 and thereafter pursued a patent application based on the product.

105. GP Innovations refers to its product SHIVA 5500 as a "multipolymer binder system," (Reply in Supp. of Mot. for Prelim. Inj. Ex. 2, ATG Direct Brochure, ECF No. 99.2), which has a polyamide as its main component, (Greer PI Aff. at ¶ 148).

31

106.    On ▓▓▓▓▓▓▓, Greer filed a provisional patent application titled "▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" to secure protection for SHIVA 5500. (Excerpts

Greer Dep. Second at 289–90.)

107.    Ennis-Flint contends that the polyamide of SHIVA 5500 disclosed in

that application is based on misappropriation of its formula PAF2526 and has

provided a side by side comparison of the two formulas in support of this argument.

(Hepler Fourth Aff.)

108.    Five files relating to PAF2526 were on the Toshiba Transmemory device

Greer connected to his work computer on September 8, 2017. (McMinn Second Aff.,

Ex. C., ECF No. 137.) Greer did not turn this device in on the day of his resignation.

(Young First Aff. at ¶15.) A Toshiba Transmemory device was connected to Greer's

laptop on March 9, 2018 when Greer was running the Eraser program to destroy

evidence on his internal hard drive and various external devices. (McCollough Second

Aff. Ex. 2, ECF No. 129.2.)

109.    However, the forensic evidence to date does not otherwise document that

Defendants accessed PAF2526 after Greer left Ennis-Flint's employ. (Hepler Third

Aff. Ex. 1.)

### III.    CONCLUSIONS OF LAW

110.    Any Conclusion of Law that is more appropriately considered a Finding

of Fact should be so considered.

111.    The purpose of an injunction "is ordinarily to preserve the *status quo* . .

. [and i]ts issuance is a matter of discretion to be exercised by the hearing judge after

32

a careful balancing of the equities." *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 400, 302 S.E.2d 754, 759 (1983) (quoting *State v. School*, 299 N.C. 351, 357-58, 261 S.E.2d 908, 913 (1980)). A party seeking an injunction must show (i) likelihood of success on the merits and (ii) that movant is likely to sustain irreparable loss absent an injunction or that an injunction is necessary to protect its rights during the litigation. *Id.* at 401, S.E.2d at 759–60; *see also* N.C. R. Civ. P. 65; N.C. Gen. Stat. § 1-485.

112. Our Supreme Court has defined "irreparable injury" as not necessarily "beyond the possibility of repair or possible compensation in damages, but that the injury is one to which the complainant should not be required to submit or the other party permitted to inflict, and is of such continuous and frequent recurrence that no reasonable redress can be had in a court of law." *Barrier v. Troutman*, 231 N.C. 47, 50, 55 S.E.2d 923, 925 (1949). If irreparable injury is not shown, the preliminary injunction will be denied. *See United Tel. Co. of Carolinas, Inc. v. Universal Plastics, Inc.*, 287 N.C. 232, 236, 214 S.E.2d 49, 52 (1975); *see also Coble Dairy Products Coop., Inc. v. State ex rel. N.C. Milk Comm'n*, 58 N.C. App. 213, 214, 292 S.E.2d 750, 751 (1982).

113. Moreover, "[a] court of equity must weigh all relevant facts before resorting to the extraordinary remedy of an injunction." *Travenol Labs., Inc. v. Turner*, 30 N.C. App. 686, 694, 228 S.E.2d 478, 484 (1976). The burden is on the moving party to establish its right to a preliminary injunction, but the remedy "should not be lightly granted." *GoRhinoGo, LLC v. Lewis*, 2011 NCBC LEXIS 39, at

33

*17 (N.C. Super. Ct. Sept. 29, 2011); *see also Travenol Labs.*, 30 N.C. App. at 692, 228 S.E.2d at 483. A trial court generally "should engage in a balancing process, weighing potential harm to the plaintiff if the injunction is not issued against the potential harm to the defendant if injunctive relief is granted." *Kaplan v. Prolife Action League of Greensboro*, 111 N.C. App. 1, 16, 431 S.E.2d 828, 835 (1993), *overruled on other grounds by Sharpe v. Worland*, 351 N.C. 159, 166, 522 S.E.2d 577, 581 (1999).

114. Under the North Carolina Trade Secrets Protection Act ("NCTSPA"), "actual or threatened misappropriation of a trade secret may be preliminarily enjoined during the pendency of the action and shall be permanently enjoined upon judgment finding misappropriation . . . ." N.C. Gen. Stat. § 66-154(a). Actual or threatened misappropriation may be established by the introduction of "substantial evidence" that a person against whom relief is sought "[k]nows or should have known of the trade secret; and [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent of the owner [of the trade secret]." N.C. Gen. Stat. § 66-155. A defendant may rebut an owner's claim of misappropriation by proving that the defendant acquired the owner's trade secret information through independent development or reverse engineering, or by proving that the owner's "trade secret" information was received from another person with a right to disclose the information or is generally known in the industry. N.C. Gen. Stat. §§ 66-155, 66-152. *See Computer Design & Integration, LLC v. Brown*, 2017 NCBC LEXIS 8, at *21–22 (N.C. Super. Ct. Jan 27, 2017).

34

115. The Greer Agreement was supported by good and valuable consideration, was intended to and did promote Ennis-Flint's legitimate business interest, and is enforceable in accordance with its terms. *See Amerigas Propane, L.P. v. Coffey*, 2015 NCBC LEXIS 93 at \*24 (N.C. Super. Ct. Oct. 15, 2015).

116. The time period governing the noncompete and nonsolicitation covenants in the Greer Agreement have expired. However, the contractual covenant to protect and honor "Trade Secrets" as defined by the Greer Agreement survives.

117. Ennis-Flint is entitled to have the contractual protection of its confidential information enforced whether or not such information separately qualifies as a trade secret as defined by the NCTSPA.

118. The Greer Agreement executed with Flint Trading, Inc. was validly assigned to and can be enforced by Ennis-Flint. *See Morton v. Thornton,* 259 N.C. 697, 699–700, 131 S.E. 2d 378, 380–381.

119. Ennis-Flint has demonstrated a likelihood of success on its claim that Greer breached the Greer Agreement, and, but for a preliminary injunction, may do so again, causing significant harm to Ennis-Flint.

120. Ennis-Flint has demonstrated a likelihood of success on its claim that the information described in paragraph 17 above constitutes business or technical information, including formulas, programs, compilations of information, methods, techniques or process, which derive actual or potential commercial value from not being generally known or readily ascertainable through independent development of

reverse engineering by persons who can obtain economic value from its disclosure or use. *See* N.C. Gen Stat § 66-152.

121. Ennis-Flint has demonstrated a likelihood of success in proving that it has taken efforts reasonable under the circumstances to maintain the secrecy of its trade secrets. *See* N.C. Gen. Stat § 66-153.

122. Ennis-Flint has demonstrated a probability of its success in proving that the Ennis-Flint Trade Secrets defined in paragraph 17 above are both "Trade Secrets" as that term is defined by the Greer Agreement, and are trade secrets as defined by the NCTSPA.

123. Ennis-Flint has sufficiently and particularly identified the Ennis-Flint Trade Secrets.

124. Defendants have fair notice of what constitutes the Ennis-Flint Confidential Information and the Ennis-Flint Trade Secrets which are the subject of the injunction entered by this Order & Opinion.

125. Ennis-Flint has shown a probability of success in proving that Greer misappropriated both Ennis-Flint Confidential Information and Ennis-Flint Trade Secrets by copying, retaining, and accessing files without authorization or permission.

126. The mere fact that a product or formula theoretically can be reverse engineered or has been developed by another does not preclude its protection as a trade secret. *See* N.C. Gen. Stat. § 66-152; *see also* Milgrim on Trade Secrets 7.02[1][b].

36

127. The mere fact that a product or formula can, with sufficient effort and time, ultimately be reversed engineered does not necessarily mean that it can be "readily" ascertained or that the effort required to do so would yield actual economic value.

128. One who seeks to defend a claim of trade secret misappropriation through independent development should be expected to demonstrate that efforts were taken independently and without unfair access to information possessed by the holder of the trade secret. *See Kewanee v. Bicron*, 416 U.S. 470 (1974). That is:

> The protection accorded the trade secret holder is against the disclosure or unauthorized use of the trade secret by those to whom the secret has been confided under the express or implied restriction of nondisclosure or nonuse. The law also protects the holder of a trade secret against disclosure or use when the knowledge is gained, not by the owner's volition, but by some "improper means," Restatement of Torts § 757(a), which may include theft, wiretapping, or even aerial reconnaissance. A trade secret law, however, does not offer protection against discovery by fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering, that is by starting with the known product and working backward to divine the process which aided in its development or manufacture.

*Id.* at 475–76.

129. Greer has not demonstrated any legitimate basis for his having gathered the extent of confidential information from Ennis-Flint databases and then taking that information with him after ending his employment. He has failed to demonstrate that he did so for the sole purpose of the potential need of such information in connection with a potential whistleblower action.

130. Under the facts of this case, the Court need not resolve the legal issue whether misappropriation has been proven where, after the termination of his employment, a former employee merely continues to possess confidential information

37

which came into his possession with express or implied consent during the course and scope of his employment. *Cf. RLM Commc'ns., Inc. v. Tuschen*, 831 F.3d 190 (4th Cir. 2016)(discussing North Carolina trade secret misappropriation law and outlining standard for evaluating misappropriation by former employees). Ennis-Flint has demonstrated a likelihood of success in proving that Greer first copied, then took and accessed such information after his employment had ended, all beyond the scope of any reasonable permission or authority Ennis-Flint may have granted Greer during the course of his employment.

131. Ennis-Flint has demonstrated a likelihood of success in proving that Defendants misappropriated Ennis-Flint's formulas PAF2735 and PAF2526, and directly or indirectly used those formulas when developing ARES 318 and SHIVA 5500.

132. Ennis-Flint has demonstrated that it will suffer irreparable harm if Defendants are not enjoined from further access, use or distribution of Ennis-Flint Confidential Information or Ennis-Flint Trade Secrets.

133. Money damages would not be adequate to compensate Ennis-Flint for the misuse or misappropriation of its Ennis-Flint Confidential Information or Ennis-Flint Trade Secrets.

134. The balance of equities favors Ennis-Flint. *See Bd. Of Provincial Elders v Jones*, 273 NC 174, 184 (1968); *see also Cty. of Johnston v Cty. of Wilson*, 136 NC App 775, 780 (2000).

135. The Court has taken adequate precaution to draft its injunction as narrowly as reasonably necessary to protect Ennis-Flint.

136. Ennis-Flint is entitled to a preliminary injunction pursuant to N.C. Gen. Stat. § 1-485(2) to enforce the Greer Agreement's prohibition on the use of Ennis-Flint Confidential Information

137. Ennis-Flint is entitled to an injunction pursuant to N.C. Gen. Stat. § 66-154 to protect against Defendants' continuing misappropriation of Ennis-Flint Trade Secrets.

138. Ennis-Flint has satisfied its burden to obtain a preliminary injunction. *See Analog Devices, Inc. v. Michalski*, 157 NC App 462, 466, 579 S.E.2d 449, 452 (2003); *see also Looney v. Wilson*, 97 NC App 304, 307–08, 388 S.E.2d 142, 144 (1990).

139. This injunction is necessary to preserve the status quo of the subject matter until final resolution of this matter on its merits. *See United Tel. Co. v. Universal Plastics, Inc.*, 287 N.C. 232, 235, 214 S.E.2d 49, 51 (1975).

140. The Court has fully considered (1) the extent to which Ennis-Flint's information is known outside the business; (2) the extent to which it is known to employees are guarded from others involved in the business; (3) the extent of measures Ennis-Flint has taken to guard secrecy of its information; (4) the potential value of Ennis-Flint's information to its business and its competitors; (5) the amount of effort and money Ennis-Flint has expended in developing the information; and (6) the ease or difficulty with Ennis-Flint's could properly be acquired or duplicated by

others. *State ex rel. Utils. Comm'n v. MCI Telecomms., Corp.*, 132 N.C. App. 625, 627, 514 S.E.2d 276, 278 (1999).

141. The Court's injunction fairly protects Greer's right to utilize his general training and know-how in pursuit of his livelihood provided that he does so consistent with his contractual undertakings and Ennis-Flint's statutory protections. *See Kadis v. Britt*, 224 N.C. 154, 164, 29 S.E.2d 543, 549 (1944).

142. To determine that it should issue a preliminary injunction, the Court has not been required to utilize any negative inference arising from the clear and admitted spoliation of evidence. However, a negative inference would be warranted. *See Pension Comm. of the Univ. of Montreal Pension Plan v. Banc. of Am. Secs., LLC*, 2010 U.S. Dist. LEXIS 4546 at 19 (S.D.N.Y Jan 15, 2010); *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 109 (2d Cir. 2002). Further, spoliation of evidence demonstrates bad faith and can support issuing a broader injunction than might otherwise be necessary. *See Barker Indus. v. Gould*, 146 N.C. App. 561, 565, 553 S.E.2d 227, 230 (2001).

143. Defendants' spoliation further casts substantial doubt on their ability to prove a defense of independent development.

144. The Court at this time reserves whether it should strike Defendants' Answer. However, the Court concludes that the Fifth Defense does not foreclose Ennis-Flint from receiving injunctive relief.

145. The Court reserves its further consideration of sanctions, including potential further injunctive or preclusive relief.

40

146. The Court retains the right to modify this Preliminary Injunction and to make it permanent as a part of sanctions it may impose.

## IV. CONCLUSION

WHEREFORE, based upon the foregoing Findings of Fact and Conclusions of Law, it is hereby ORDERED, in the exercise of the Court's discretion, that pending final resolution of this action, and unless and until otherwise ordered by the Court:

1. The following injunction shall apply to Defendants, each of them, their officers, agents, servants, employees, and attorneys, and any and all persons or entities in active concert or participation with them who receive actual notice by personal service or otherwise.

2. For purposes of this injunction, the term "Ennis-Flint Confidential Information" is based on the definition of "Trade Secrets" in the Greer Agreement and is defined as "confidential information of Ennis-Flint relating to Ennis-Flint's products and services, including without limitation technical and marketing information regarding the processes, practices, expertise, and know-how of Ennis-Flint, the pricing policies and other business and financial operations of Ennis-Flint, lists of past and present customers of Ennis-Flint, and information regarding customer relationships under development or intended to be developed by Ennis-Flint," provided that the definition "shall not include any information that … is or becomes part of the public knowledge or literature other than as a result of any action by [Greer] in violation of this Agreement," and provided further that, the term shall not extend to such general information and know how Defendants may have

41

regarding the development, composition and use of polyamides and hot melt adhesives which is not specific to formulas, practices, or processes specific to Plaintiff not generally known to the public.

3. For purposes of this injunction, the term "Ennis-Flint Trade Secrets" is as defined in paragraph 17 of this Order & Opinion but shall not be deemed to include such general information and know how Defendants may have regarding the development, composition and use of polyamides and hot melt adhesives which is not specific to formulas, specifications, analytical data and research, costing data and other confidential and proprietary date specific to Ennis-Flint, or information which has, through no fault of the Defendants, become generally known to the public.

4. To the extent they have not done so, Defendants are directed to deliver to their counsel within three business days of the date of this Order & Opinion any and all Ennis-Flint Confidential Information or Ennis-Flint Trade Secrets in their possession, whether it exist in tangible or intangible form and thereafter not otherwise use, duplicate, or distribute such information in any manner. While Defendants are enjoined from using Ennis-Flint Confidential Information or Ennis-Flint Trade Secrets as retained in memory, the obligation to return such material is limited to that which has been reduced to written or electronic form.

5. Defendants shall within three days of this Order & Opinion deliver to their counsel the following six devices identified by Jason McCollough of Envista Forensics on or about December 3, 2018, to wit:

a. S-1-5-21-1460244919-252889898-2310478422-1001

b. S-1-5-21-1494329016-2321820997-3977563948-1001

c. S-1-5-21-1702796428-3073726147-642707671-1000

d. S-1-5-21-463383429-3785356713-3985158652-1001

e. S-1-5-21-760287981-1860692343-1304107884-1000

f. Western Digital external hard drive

Before doing so, Defendants shall neither duplicate nor modify any of these devices or information stored on them. If Defendants no longer possess one or more of the devices, they shall provide a sworn written statement to Plaintiff's counsel detailing the reason that Defendants no longer possess them. Defendants' counsel shall then preserve these devices pending the Court's further order as to potential further forensic examination.

6. For clarification and emphasis, the Order & Opinion expressly prohibits Defendants from deleting, altering, duplicating, or making back-up copies of any Ennis-Flint Confidential Information or Ennis-Flint Trade Secrets, or any medium or device reasonably expected to contain such information.

7. Pending further Order of the Court, Defendants shall not take further direct or indirect steps to develop, market, or sell any version or derivative of ARES 318 or SHIVA 5500, including, but not limited to, "SpiderBond Flex+ 5772," or otherwise to use the formulas set out in GREER DOCS 824, 825, 841, 844 & 848.

8. Pending further Order of the Court, Defendants shall not further prosecute any patent application or seek patent protection, domestically or internationally, based on the invention described in pending provisional patent

applications titled "████████████████████████████████████" filed on ███████████, (Application Number ██████) and ████████████, (Application Number ██████) (the "Provisional Patent Applications"), or otherwise based on the ARES 318 and/or SHIVA 5500 formulations. The Court expressly retains jurisdiction to modify the provisions of this paragraph.

9.      The Court expressly reserves the right to issue further injunctive relief as may be appropriate in its ruling on Plaintiff's Motion for Sanctions.

10.     Ennis-Flint shall post security in the amount of $5,000.00 with the Guilford County Clerk of Superior Court. The Consent Temporary Restraining Order shall remain in place until the earlier of ten days from the date of this Order & Opinion or the filing of the security hereby ordered, after which time the Consent Temporary Restraining Order shall be superceded by this Order & Opinion.

11.     This Order & Opinion shall remain in effect during the pendency of this litigation until further order of this Court.

12.     The Court will convene a status conference to address the extent, if any, of further forensic examination as may be necessary and appropriate.

IT IS SO ORDERED this 4th day of February, 2019.

/s/ James L. Gale
James L. Gale
Senior Business Court Judge